IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
May 21, 2020

IN RE:

**MICHAEL H. WOODS,**

Debtor.

Case No. 18-10704-M
Chapter 7

**MARCIA SLACK,**

Plaintiff,

v.

**MICHAEL H. WOODS,**

Defendant.

Adv. No. 18-01038-M

## MEMORANDUM OPINION

If you were a child in the 1960s (a vanishing breed, for sure) you probably watched a television show called "Hogan's Heroes." The comedy, set in a POW camp in Nazi Germany,[1] documented the adventures and misadventures of a very active group of prisoners of war who were constantly engaged in sabotage and espionage to further the Allied war effort. One of the central characters in the show was Sergeant Hans Schultz, played by John Banner.[2] Sergeant Schultz was prone to walk in on the cloak-and-dagger antics of the prisoners, only to walk away uttering the phrase "I know nothing. NOTHING." Next to Laugh-In's "sock it to me," "I know nothing" was

---

[1] An untenable premise today, to be certain. However, the show ran for six seasons on CBS, the longest running American television series based upon the Second World War. https://en.wikipedia.org/wiki/Hogan's_Heroes.

[2] John Banner (1910-1973).

one of the iconic catch phrases of the era.[3]

The phrase "I know nothing" has found a new home in this adversary proceeding. As the facts unfold, there is little doubt that our protagonist has been defrauded out of a quarter of a million dollars, all of which was allegedly invested in an oil and gas company that generated not one thin dime in profits. The primary defense offered by the defendant is a simple "I know nothing," laying any fraudulent representations at the feet of one of his business colleagues. The questions before the Court are whether, in fact, the defendant "knew nothing," and/or whether he is charged with the knowledge and intent of his colleague and business partner in this failed adventure. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

**Jurisdiction**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).[4] Its reference to this Court is proper pursuant to 28 U.S.C. § 157(a). Issues of nondischargeability of debt are core proceedings under the terms of 28 U.S.C. § 157(b)(2)(I).

**Burden of Proof**

The issue before the Court is whether a debt owed by the defendant to the plaintiff should be excepted from discharge under § 523(a)(2)(a) and (a)(4) of the Bankruptcy Code. Exceptions to discharge are to be narrowly construed in favor of the debtor so as to promote the "fresh start"

---

[3] *See* https://en.wikipedia.org/wiki/Rowan_%26_Martin's_Laugh-In ("'Sock it to me'; Judy Carne was often tricked into saying the phrase ("It may be rice wine to you, but it's still sake to me!"), which almost invariably led to her (and other cast members) falling through a trap door, being doused with water, or playfully assaulted in various other manners. The phrase was also uttered by many of the cameo guest stars, most notably Richard Nixon, though they were almost never subjected to the same treatment as Carne.").

[4] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

2

policy of the Bankruptcy Code.[5] Under § 523, a creditor seeking to except its claim from discharge must prove the claim is nondischargeable by a preponderance of the evidence.[6]

## Findings of Fact[7]

In January of 2015, Marcia Slack ("Ms. Slack") was a widow caring for her elderly mother. She was also in a relationship with Joseph Shane Jackson ("Jackson"),[8] and, most importantly to our story, in possession of $250,000 in cash. But not for long.

Jackson was engaged in the oil and gas business. One of the people he had worked with in that field since at least 2012 was Michael Woods, the defendant in this adversary proceeding ("Woods" or "Defendant").[9] In January of 2015, Woods was a shareholder in an entity called SunRay Operating Company, LLC ("SunRay Operating").[10] SunRay Operating was described as a "pass-through" company created to operate and manage oil production. SunRay Operating was

---

[5] *See Jones v. Jones (In re Jones),* 9 F.3d 878, 880 (10th Cir. 1993).

[6] *Id.* (*citing Grogan v. Garner,* 498 U.S. 279, 291 (1991)).

[7] The shortest distance between two points is a straight line. The trial of this adversary proceeding was anything but. In three days, counsel for the Plaintiff took the Court on a disjointed journey that went back and forth and covered several areas that were not germane to the issues presented. Much of the evidence presented related to the time frame after the alleged fraudulent representations, and is therefore of little use in answering the question of whether Ms. Slack was defrauded. If this Court were to recite all of the "facts" presented at trial, this opinion would become a chapter book. The Court will include only the facts relevant to its decision.

[8] This relationship was described as romantic in nature, and the parties introduced into evidence several screenshots of text messages from Jackson professing his love for Ms. Slack. Romantic text messages may abound in the world, but having them introduced as evidence in a trial over dischargeability of debt is a first for this bankruptcy judge. Nothing further need be said, as the exact nature of the relationship between Ms. Slack and Jackson does not figure in to the decision.

[9] *Pre-Trial Order,* § II (2).

[10] *Id.*, § II (3).

not expected to operate at a profit. The profits from oil and gas operations were to be received by a separate entity, SunRay Resources, LLC ("SunRay Resources").

The transaction was structured so that SunRay Resources would be owned by Ms. Slack and an entity called Anticline, LLC ("Anticline"). Anticline was to be the "managing member" of SunRay Resources.[11] The business address of Anticline was the same as the Debtor's address.[12] The owners of Anticline were Debtor, Jackson, Steven Blair ("Blair"), and Greg Carlson ("Carlson"). According to Debtor, each of these individuals had various responsibilities, both to Anticline and to SunRay Resources. Jackson's responsibilities were "field engineer[ing] and fundraising."[13] None of the principals of Anticline, including Debtor, intended to put any money into Anticline or SunRay Resources in early 2015, if ever.[14] Debtor knew that SunRay Resources needed cash (someone else's cash, to be precise), and he and the other members of Anticline sent Jackson out to raise it.

Once Jackson knew of the $250,000 held by Ms. Slack, he sought to interest her in investing in SunRay Resources. In January of 2015, Jackson told Ms. Slack that if she were to invest her $250,000 in SunRay Resources, she, her children, and her children's children "would never have to worry about money ever again." A tempting proposition, to be sure. As she considered whether to invest in SunRay Resources, Ms. Slack enlisted the aid of her daughter,

---

[11] *Exhibit 1-5.*

[12] *Exhibit 1-1.*

[13] *Trial Transcript, Docket No. 51* (hereafter *"Transcript"*), Page 246, Line 25 through Page 247, Line 1.

[14] *See, e.g., Exhibit 201*, Page 24, Lines 1 through 22 (Steven Blair); *Transcript*, Page 395, Line 22 through Page 396, Line 11 (Greg Carlson stating that prior monies invested "carried over" into SunRay Resources).

4

Lauren Bliss Brazil ("Lauren").[15] On January 22, 2015, Lauren sent Jackson an email containing several questions about SunRay Resources and the proposed investment.[16] One question was especially germane to our case: "Are all managers/members each putting in the $250,000 in cash?"[17] Later that same day, Jackson responded by email[18] to each of the questions posed by Lauren, including the question regarding cash investments in SunRay Resources:

> Are all managers/members each putting in the $250,000 in cash? ***There is [sic] a total of 5 partners; Michael Woods, Steven Blair, Greg Carlson, Shane Jackson, all of which make up Anticline, LLC at 75%, and Marcia at 25%. Each will put up proportionate share.***[19]

On this basis, Lauren concluded that were the transaction to go forward, Ms. Slack would be investing $250,000 and the members of Anticline would be investing additional cash in SunRay Resources in an amount proportionate to their interests.[20] This was a critical aspect of the transaction to both Lauren and Ms. Slack. Ms. Slack testified without objection that, had she known hers was the only money to be placed in SunRay Resources, she would not have made the

---

[15] Lauren testified at trial. Counsel for Ms. Slack chose to keep her education and business experience a mystery, as not a single question regarding those highly relevant issues was posed to her. Having listened to her testimony, and observed her demeanor on the stand, the Court finds that Lauren is an intelligent and sophisticated businesswoman, well qualified to assist her mother in reviewing this potential investment.

[16] *Exhibit 10*.

[17] *Exhibit 10-1*.

[18] *Exhibit 13*.

[19] *Exhibit 13-4*.

[20] Simple mathematics suggests that if Ms. Slack was investing $250,000 in exchange for a 25% interest in SunRay Resources, Anticline (through its members) would be investing $750,000 for its 75% interest.

investment.[21] In addition, Jackson provided Lauren with cash flows projecting that SunRay Resources would generate a net positive cash flow of $335,550 in the first six months of its operation.[22]

While Debtor was admittedly aware of the ongoing dialogue between Lauren and Jackson, he claimed to have no knowledge of any questions about whether the members of Anticline would be investing cash in SunRay Resources. Debtor testified that while he assisted Jackson in answering some of the questions posed by Lauren in her email, he remained blissfully unaware of an inquiry regarding who else was putting money into SunRay Resources, and never saw any of Lauren's questions in writing. A most convenient ignorance, to be sure. On the other hand, Jackson testified that Woods was copied on all email correspondence between Jackson and Lauren "to make sure that all the questions got answered."[23] The Court accepts Jackson's testimony in this regard, and finds that Woods was emailed a copy of all of the questions submitted to Jackson by Lauren.[24]

While Woods may not have written Jackson's email response to Lauren, he authored a

---

[21] *Transcript*, Page 340, Lines 17 through 20.

[22] *Exhibit 20.*

[23] *Exhibit 203*, Page 141. Line 12 through Page 142, Line 15.

[24] This finding is not made lightly. The Court is in the unenviable position of choosing between two completely different stories told by two witnesses, neither of which the Court finds especially credible. The Court chooses to accept Jackson's version of these facts, because it seems highly unlikely that Jackson would make representations regarding the operations and future of SunRay Resources without input from Woods, and Woods' testimony that he totally kept his distance from Jackson and his efforts to raise the cash necessary to operate SunRay Resources is simply too convenient, as is Woods' testimony that he "didn't care" if Ms. Slack invested in SunRay Resources. Given that SunRay Resources was dead in the water without money, and that none of the members in Anticline intended to put their own funds at risk, Woods must have cared about obtaining cash investments in SunRay Resources.

document entitled "SunRay Resources, LLC Operating Agreement" (the "Operating Agreement").[25] Ms. Slack reviewed the Operating Agreement prior to making her investment in SunRay Resources. Section V of the Operating Agreement,[26] entitled "Capital Provisions," provided that

> **V. CAPITAL PROVISIONS**
>
> *(1) Capital Contributions by Members:* Members shall make the following contributions of cash, property or services as shown next to each member's name below. Unless otherwise noted, cash and property described below shall be paid or delivered to the LLC on or by the closing date as set forth in the Company Formation Participation Agreement dated June, 12, 2013 [sic]. The fair market values of items of property or services as agreed between the LLC and the contributing member are also shown below. The percentage interest in the LLC that each member shall receive in return for his or her capital contribution is also indicated for each member.
>
> | Name | Percentage Interest in LLC |
> |---|---|
> | Marcia Slack - Member | 25.00% |
> | Anticline, LLC - Managing Member | 75.00% |
> |  |  |
> |  |  |
> |  |  |
> | Total | 100.00000% |

---

[25] *Exhibit 1*. Although Exhibit 1 was unsigned, Woods admitted that this was the operating agreement for SunRay Resources, and was binding upon all parties.

[26] *Exhibit 1-5*.

7

The Operating Agreement listed Woods, Jackson, Greg Carlson, and Steven Blair as the "non-member managers" of SunRay Resources.

On February 2, 2015, Ms. Slack wrote her check for $250,000 payable to SunRay Resources and delivered it to Jackson. The check was deposited by Woods into an account in the name of SunRay Resources at Prosperity Bank in Tulsa (the "SunRay Resources Account"). According to Ms. Slack, Jackson was abusive toward her until she delivered the check, represented that the other member of SunRay Resources had already put their cash into SunRay Resources, and that her delay was threatening their chances for success. Whatever he may have said, the truth of the matter was that no one, not Anticline, nor Woods, or Jackson, or Greg Carlson or Steven Blair, sunk one thin dime of their own money or one bit of property into SunRay Resources in 2015. Yet these individuals, through Anticline, owned 75% of SunRay Resources. If 25% of SunRay Resources was worth $250,000, the Court is left to ponder what Anticline or any of its members placed in SunRay Resources that was worth $750,000.

At trial, Woods attempted to explain his failure to place any cash into SunRay Resources by contending that Anticline was placing "services" into SunRay Resources, and that this was contemplated under the terms of the Operating Agreement. Several weaknesses in this testimony cause the Court to give it no weight. Anticline is a conglomeration of 4 individuals: Woods, Jackson, Greg Carlson and Steven Blair. None of them invested cash in Anticline. The corporate existence of Anticline is suspect. It never obtained a federal employee identification number (EIN). Anticline never had a bank account. When SunRay Resources filed its tax returns for 2015, it issued K-1s (Partner's Share of Income, Deductions, Credits, etc.) to Ms. Slack, Woods, Jackson, Carlson, and Blair *individually*. Anticline is nowhere to be found.

Woods claims that he personally performed services for SunRay Resources that qualified

8

as his capital contribution under the Operating Agreement. However, Woods failed to quantify or describe with particularity any such services provided, certainly none that would be worth $750,000. Moreover, Woods paid himself for many of the services he ostensibly performed for SunRay Resources. For example, on February 6, 2015, Woods wrote a check to himself on the SunRay Resources Account in the amount of $5,000.[27] Upon questioning, Woods testified that this payment was for creation of the "formation documents" with respect to SunRay and Anticline. Similarly, on March 10, 2015, Woods wrote himself a check from the SunRay Resources Account for $1,262.77.[28] When asked about the purpose of that check, Woods responded "I don't know."[29] One cannot be paid for services and claim that those same services constitute a "capital contribution" to the company. Moreover, these services appear quite minimal when compared to the $250,000 invested by Ms. Slack, and can hardly be said to justify the majority interest in SunRay Resources held by Anticline and its members. The same is true with respect to the other members of Anticline. Carlson testified that he performed "bookkeeping" (not accounting services) for SunRay Resources on an as needed basis, without attempting to quantify the value of services rendered. Blair testified he was *given* a 25% interest in *SunRay Resources* (not Anticline) in exchange for services previously rendered, had no intention of investing his own money in SunRay Resources, and unequivocally informed Jackson that he would not be putting any money into SunRay Resources.[30]

---

[27] *Exhibit 5-7*.

[28] *Exhibit 5-11*.

[29] *Transcript*, Page 125, Line 24 through Page 126, Line 3.

[30] *Exhibit 201 (Blair Deposition)*, Page 24, Lines 1 through 22, Page 56, Lines 4 through 20, Page 107, Lines 11 through 16.

9

Finally, the claim that services were being provided by members of Anticline (including Woods) in lieu of cash does not comport with the terms of the Operating Agreement drafted by Woods. In the event property or services were being provided instead of cash, the Operating Agreement required a description of those items, together with a statement of their fair market value.[31] There is no such itemization or valuation to be found.

Debtor made clear in his testimony that he never intended to invest his own money in either Anticline or SunRay Resources, nor did he intend to cause Anticline to invest money into SunRay Resources from any other source in early 2015. The Court finds that Woods intended to commence the operations of SunRay Resources in February 2015 without any capital investment other than Ms. Slack's $250,000. As a result, Ms. Slack was the only member of SunRay Resources at risk of losing her money. The Court finds that Woods was aware of the concerns raised by Lauren and Ms. Slack regarding whether additional monies would be invested into SunRay Resources, was or should have been aware of Jackson's response to the effect that additional monies would be invested, and drafted an operating agreement implying the investment of additional capital by Anticline and/or its members.

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

## Conclusions of Law

*§ 523(a)(2)(A)*

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt

**(2)** for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

**(A)** false pretenses, a false representation, or actual fraud, other than a statement

---

[31] *Exhibit 1-5*.

respecting the debtor's or an insider's financial condition.[32]

False pretenses, a false representation, and actual fraud are separate and distinct grounds for denying the discharge of a particular debt under § 523(a)(2)(A).[33]

In order to prevail on a claim under § 523(a)(2)(A) for a false representation, a creditor must establish each of the following elements by a preponderance of the evidence:

(1) That a representation was made by the debtor;

(2) That the representation was false;

(3) That the representation was made with the intent to deceive the creditor;

(4) That the creditor relied upon the representation;

(5) That such reliance was justifiable; and

(6) That, as a result of such reliance, the creditor suffered loss.[34]

Unless all of these elements are established by a preponderance of the evidence, the debt is dischargeable.

A claim for false pretenses under § 523(a)(2)(A) is not the same as a claim for false representation. The Bankruptcy Appellate Panel of the Tenth Circuit has provided an excellent explanation of this claim:

> False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. *See Marks v. Hentges (In re Hentges),* 373 B.R. 709, 725 (Bankr. N.D. Okla.2007) (false pretenses are "implied misrepresentations or conduct intended to create and foster a false impression.") (internal quotations omitted). False pretenses can be

---

[32] § 523(a)(2)(A).

[33] *Bank of Cordell v. Sturgeon (In re Sturgeon),* 496 B.R. 215, 222–23 (10th Cir. BAP 2013).

[34] *AT&T v. Herrig (In re Herrig),* 217 B.R. 891, 895 (Bankr. N.D. Okla. 1998).

> "defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D.Pa.2006) (citing *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1019 (Bankr. N.D.Ill.1996)).[35]

When it comes to a claim for false pretenses, silence is anything but golden. The question is whether, by silence, insinuation, or inference, Debtor knowingly acted in such a fashion as to create a false impression in the mind of Ms. Slack that monies other than her own would be invested into SunRay Resources.

*False Pretenses/False Representation*

The first question is whether Ms. Slack was led to believe that there would be more than her $250,000 invested in SunRay Resources. Let us begin by looking at two documents: the responses by Jackson to the questions posed by Lauren and the Operating Agreement. Lauren's question was unequivocal: "Are all managers/members each putting in the $250,000 in cash?" Jackson's answer: "Each will put up proportionate share." Proportionate share of what? Time? Services? Jellybeans? A reasonable person would be entitled to assume since the question inquired about cash, the "proportionate share" in the response also referred to cash. The Court has found as a matter of fact that Woods was provided with a copy of this question, and was therefore aware of the concern, even if he did not draft the answer. It was reasonable for Lauren and Ms. Slack to assume that the failure of Jackson to list any property or services in lieu of cash meant that cash other than hers was being invested in SunRay Resources.

Woods admitted to drafting the Operating Agreement, which is equally opaque on the issue of cash investments in SunRay Resources. At the time Woods drafted the Operating Agreement, he knew that Anticline was not putting any money into SunRay Resources. SunRay was going into

---

[35] *In re Sturgeon.* 496 B.R. at 223 (footnote and citations omitted).

battle armed only with the capital provided by Ms. Slack. The Operating Agreement refers to "contributions of cash, property or services," and requires "the fair market value of property or services" to be included in the Operating Agreement. No such items are listed, and the failure to include a listing to of these non-cash contributions and their value constitutes a material omission for purposes of § 523(a)(2)(A). Given this omission, it was reasonable and logical for Ms. Slack to assume that Anticline (through its members) was also putting cash into SunRay Resources. The Court concludes that although Woods knew he was going to be playing only with Ms. Slack's money, he did not want her to know for fear she would take her money and run. Whether you categorize the failure to disclose this fact as acting under false pretenses or as a false representation, the effect is the same.

*Intent to Deceive*

When it comes to the issue of intent to deceive, the Court must make a factual finding regarding the subjective intent of the Debtor.[36] The United States Court of Appeals for the Tenth Circuit has held that § 523(a)(2)(A) "includes only those frauds involving moral turpitude or intentional wrong, and does not extend to fraud implied in law which may arise in the absence of bad faith or immorality."[37] Other courts have noted that "intentional deceit is a critical note in the score" of determining fraud.[38] While there are several approaches used by courts to determine

---

[36] *In re Herrig,* 217 B.R. at 897 (alleged fraudulent use of a credit card requires finding of whether at the time of the charges in question, the debtor intended to repay them).

[37] *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991); *see also DSC Nat'l Prop. v. Johnson (In re Johnson)*, 477 B.R. 156, 169 (10th Cir. BAP 2012).

[38] *See Bombardier Capital, Inc. v. Baietti (In re Baietti),* 189 B.R. 549, 554 (Bankr. D. Me. 1995). *See also Jacobs v. Mones (In re Mones)*, 169 B.R. 246, 254 n.6 (Bankr. D.D.C. 1994) (for purposes of § 523(a)(2), "debtor's conduct must involve moral turpitude or intentional wrong"); *Howard & Sons, Inc. v. Schmidt (In re Schmidt)*, 70 B.R. 634, 639 (Bankr. N.D. Ind.

13

whether a debtor has made a representation with the intent to deceive a creditor, the Tenth Circuit has adopted the "totality of the circumstances" approach.[39] Courts that have used this approach acknowledge the fact that rarely, if ever, will a debtor admit his or her intent to deceive while under oath.[40]

When Woods drafted the Operating Agreement, he knew or should have known that Ms. Slack wanted to know if the members of Anticline were putting up money as well.[41] Why did Woods draft an operating agreement that required disclosure of an investment of property or services in lieu of cash, and then fail to list those investments, especially when he apparently thought those non-cash investments were worth $750,000? Two reasons: first, there were no such investments being made, and Woods knew it, and second, because Woods did not want Ms. Slack to change her mind, withdraw her investment, and stop SunRay Resources before it even got started. The Court has no difficulty finding that Woods had the requisite intent to deceive Ms. Slack.

*Justifiable Reliance*

> The doctrine of justifiable reliance is subjective in nature and
>
> does not require the creditor prove he acted consistent with ordinary care and prudence. Instead, "[j]ustification is a matter of the qualities and characteristics of the particular [creditor], and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." A creditor is only required to make an investigation beyond the representations given where "under

---

1986) (same).

[39] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1375 (10th Cir. 1996).

[40] *Citibank, S.D., N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1090 (9th Cir. 1996).

[41] This strikes the Court as falling into the realm of common sense. Anyone investing a large sum of money is likely to want to know whether the person spending her money is placing his own funds at risk, and is equally likely to reconsider the investment when she discovers that her "partners" are playing with her money, and her money alone.

the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived."[42]

The Court must consider the circumstances in a particular case, and the knowledge and understanding of the people in those circumstances, in order to determine whether a party justifiably relied upon a false representation.

In this case, Ms. Slack and Lauren expressly made the appropriate inquiry as to other cash investments in SunRay Resources. Neither Jackson's answers to Lauren's questions nor the terms of the Operating Agreement gave any indication that the members of Anticline were not investing cash in SunRay Resources; indeed, it was logical to infer that since the Operating Agreement contained no listing of property or services being invested in lieu of cash, that cash was being invested. Ms. Slack's reliance on these representations (or upon Woods' silence) was justifiable.

*Damages*

This one is easy. Ms. Woods is out $250,000, money she never would have placed in SunRay Resources had she known no one else was investing cash. Her damages are the amount of her investment.

*Actual Fraud*

With respect to the third option under § 523(a)(2)(A), "[a]ctual fraud occurs 'when a debtor intentionally engages in a scheme to deprive or cheat another of property of a legal right.'"[43] For all of the reasons set forth above, the Court finds Woods intended to conceal the actual nature of

---

[42] *William W. Barney, M.D. P.C. Retirement Fund v. Perkins (In re Perkins),* 298 B.R. 778, 792 (Bankr. D. Utah 2003) (quoting *Field v. Mans,* 516 U.S. 59, 70-71 (1995)) (footnotes omitted).

[43] *In re Sturgeon,* 496 B.R. at 222–23 (citing *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 690 (10th Cir. BAP 2013)).

the Anticline "investment" in SunRay Resources in order to obtain her cash investment therein. This also renders the amount obtained by Woods non-dischargeable as actual fraud.

*§ 523(a)(4)*

Having determined the amount obtained from Ms. Slack to be non-dischargeable under § 523(a)(2)(A), the Court does not reach any issues under § 523(a)(4).

## Conclusion

Judgment is entered in favor of Ms. Slack and against Michael Woods in the amount of $250,000. The judgment shall not be discharged in the bankruptcy case of Michael Woods, Case No. 18-10704-M.

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 21st day of May, 2020.

BY THE COURT:

TERRENCE L. MICHAEL
UNITED STATES BANKRUPTCY JUDGE

7437v1